**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**


GERALDINE SESSA                        :
                                       : CIVIL ACTION
          Plaintiff                    :
                                       :
     vs.                               :
                                       : NO. 14-CV-2518
DELL, INC., LONG TERM DISABILITY :
INSURANCE PLAN, DELL, INC. SHORT :
TERM DISABILITY INSURANCE PLAN,  :
AETNA LIFE INSURANCE COMPANY and :
DELL, INC.                             :
                                       :
          Defendants                   :


## MEMORANDUM AND ORDER


**JOYNER, J.**                                        **June 9, 2015**


     This case has been brought before the Court on competing

motions for summary judgment of the Plaintiff and both of the

Defendants.  For the reasons outlined below, the motions shall be

granted in part and denied in part.

## History of the Case

     This is an action under the Employee Retirement Income

Security Act ("ERISA"), 29 U.S.C. §1001, *et. seq.* which was

commenced on May 1, 2014 by Plaintiff Geraldine Sessa to recover

short term and long term disability benefits from her former

employer Dell, Inc., Dell's Long Term and Short Term Disability

Plans, and Aetna Life Insurance Company as the underwriter and

benefits administrator of the Plans.  Subsequent to the denial of

those benefits, Plaintiff exhausted all of her appeals before filing this suit. (Aetna 0480-0481, 1141-1143).

As the administrative record in this matter reflects, Plaintiff was hired as an Outside Sales Specialist II for Dell, Inc.'s Boomi Division on May 27, 2011, working out of its office located in Berwyn, Pennsylvania. According to the posted job description, this position required, *inter alia*, that Ms. Sessa: identify appropriate solutions and services to meet the full range of customers' needs, develop and manage relationships with key partners and customers, manage complex sales cycles and present to decision makers the value of Dell's full suite of applications, skillfully negotiate with others to achieve desired results and meet customer needs, forecast sales activity and revenue achievement in salesforce.com, while creating satisfied customers and perform high-level, on-time demonstrations of Dell's products and solutions via web technologies and web-based presentations. (Aetna 0840). In addition to salary, Dell offered its employees an employee benefits package which included health and dental care as well as plans covering both short and long term disability. Enrollment in the short term disability plan was automatic with employment and paid for entirely by the employer. The long term disability plan required the employee to enroll and pay a portion of the premium through payroll deduction.

Plaintiff apparently performed her job to Dell's satisfaction for several months from the time of her hire until she began experiencing cognitive problems in late summer, 2011. On September 15, 2011, Plaintiff saw her family doctor with complaints of memory loss, chest tightness, difficulty reading things and not absorbing what she read, feeling "stupid," "weird," and "funky," especially when she stood up; her head felt like it was "in a bubble," she felt feverish for a few nights, but without a fever, and she reported that she had gained 20 pounds over the past year, but without eating any more.  Ms. Sessa also complained of fatigue and reported that she had gotten on the expressway going in the wrong direction, that she had had dinner with an old boss who said she needed to get evaluated and that she had gotten written up at work for a poor presentation - she had apparently stumbled on and forgotten words.  (Aetna 0626-0627).

Over the next several months, Plaintiff underwent numerous blood tests, ultrasounds, x-rays and MRIs of virtually her entire body, an endoscopy and biopsies of the esophagus, gastric mucosa and duodenum, was treated with antibiotics and other drugs, for, *inter alia*, suspected inner ear disturbance, lupus, lyme disease, post-concussion syndrome, and gastroesophageal reflux disease. (Aetna 0629-0643, 0779-0781, 0791).  Indeed, immediately after a tympanogram test showed abnormalities, Plaintiff was advised that

she had a balance disorder and vestibular dysfunction for which she was prescribed antibiotics.  Throughout this period, Plaintiff kept her supervisor and the Human Relations officers at Dell apprised of her health problems and symptoms and of the testing she had undergone and the tentative diagnosis of balance disorder/vestibular dysfunction.  (Aetna 0693-0695).

Despite having apparently not missed any time from work as a result of her continuing health problems, Plaintiff was terminated by Dell on October 17, 2011 because she "did not make plan."  In a follow-up email to Dell Human Resources officer Noreen Manalo the same day as her firing, Plaintiff again explained that there was a medical reason for her inability to perform her job and reminded Ms. Manalo of her prior emails to her and her supervisors describing her health issues.  Plaintiff again attached copies of medical documentation from her doctors and requested "input in this matter" from Ms. Manalo.  (Aetna 0696).  Two days later on October 19, 2011, Plaintiff again emailed Ms. Manalo to advise that the Ear, Nose and Throat specialist whom she had seen the preceding day and who had diagnosed her with vestibular dysfunction was now of the opinion that Plaintiff's problems were instead neurological and he had referred her for evaluation to a neurologist.  Plaintiff also noted that she had only been "put on plan" by Dell two days after she had informed her supervisors that she had made a doctors

appointment because she was having difficulty retaining information.  (Aetna 0697, 0716, 0759).

Several days later on October 23, 2011, Plaintiff sent an email to Kimberly Gress, Director of Client Services at Dell apologizing for the problems that she was having coordinating her thoughts and expressing them and with her memory, which problems had caused her to be unable to perform her job.  She again explained that the medical testing she had undergone had led to the diagnosis of vestibular dysfunction but that it now appeared that her problems were actually neurologic.  On October 26, 2011, Ms. Gress responded only that Ms. Sessa need not apologize to her and that she hoped that she would be "able to get to the bottom of what is impacting your memory.  Good luck."  (Aetna 0698). Then, on November 4, 2011, Plaintiff again, in apparent follow up to a telephone conversation earlier that afternoon, sent an email to Noreen Manalo enclosing additional documentation and stating: "The Neurologist has confirmed that there is indeed something wrong that has affected my thinking.  My initial MRI showed an abnormality which right now has been diagnosed as MS."  (Aetna 0699-0701, 0732-0736, 0755).   There is no evidence in the record that Ms. Manalo ever responded to any of these email communications.

Over the next several months, Plaintiff continued to undergo testing, including a lumbar puncture (spinal tap) to confirm the

multiple sclerosis diagnosis. (Aetna 0717-0736, 0763-0767, 0785-0806). In an email on April 2, 2012 to Noreen Manalo, Plaintiff advised that

> "it was determined in March that I was suffering from post concussion syndrome and clinically probable multiple sclerosis," and "I have been under the care of two neurologist [sic]. One from the MS center at Jefferson University Hospital and a primary neurologist. Attached please find a letter from Fred Weinblatt, MD, regarding my final diagnosis." (Aetna 0702).

Four days later, Ms. Manalo did respond:

> Hi Geri,
> Since a medical claim wasn't submitted and targets weren't being met during your employment, the termination still stands however, you can reapply to any of our open requisitions. The link to our website is below.

Plaintiff responded back later that same day:

> Noreen,
>
> Thanks for the email. I will take a look at the link. I know that my termination would still stand as I did not make plan. My inquiry to you had to do with short term disability. I have been told that because my disability occurred prior to the end of my employment, I would also be eligible to apply for short term/long term disability benefits. I have been told that this is true, even if I was terminated prior to the time when disability benefits would begin. I did email the receipts of my Dr. Visits before being terminated when the initial issues occurred and I began to be tested. I also emailed you the copies from these initial visits after being terminated. I have all the records, of all the tests that were done after my termination.
>
> How do I move forward applying for these benefits as I truly was completely disabled from working for the last 6 months?
>
> Regards,
> Geri Sessa

Fifteen minutes later, Ms. Manalo replied:

> Hi Geri,
> I would refer you to our Benefits Call Center at 888-DELL-ONE, option 5 to speak to an Aetna leave specialist.  When you get someone live, please ask to talk to a Disability Manager.  They will be the ones to ask your question.

On April 10, 2012, Ms. Manalo followed up with:

> Hi Geri,
> Were you able to contact Aetna?
> I had also reached out to Dell Benefits and below is the answer.  Since you did not go on leave in September, you were not eligible for STD.
>
> -If Geri Sessa was terminated 10/17/2011 and is just now wanting to file a claim with Aetna for a condition that had her out of work (if this is the case) prior to 10/17/11, it is too late.
>
> - If she went out sometime in September of 2011, contacted Aetna within 8 days into her disability for a medical condition that took place prior to termination, and supporting documentation was submitted by her doctor and was approved by Aetna, then she could possibly continue to be approved STD and/or LTD.
>
> If you have further questions, please let me know or contact Aetna.

(Aetna 0702-0705)(emphasis in original).

Apparently, Plaintiff took no further action until late August, 2012 when she again contacted Noreen Manalo (now Noreen Obiacoro) via phone and email to obtain a detailed description regarding the Aetna Long Term Disability policy in effect while she was at Dell, as she could only locate a summary of the plan. (Aetna 0706).  Ms. Obiacoro then wrote via email dated August 29, 2012:

> Hi Geri,
>
> Benefits gave me the same response as I had given you back

in an email dated 4/10/2012.  Below is what was in the email
and is the same info that has been given to me today.  Since
a claim wasn't filed when you were employed with Dell, the
STD/LTD benefits didn't apply.  The key here is that you
were eligible for STD when you were employed but since you
are no longer employed, you don't have that benefit.  If you
did file a claim while you were employed and the claim was
approved, then you would've received STD benefits. ...

(Aetna 0706).

  Plaintiff responded the next day:

    Noreen,

    Thank you for your email but I did not ask about the
    coverage. I asked for copy of the LTD policy I had in place
    at the time I worked at Dell.  Are you able to provide me
    with a copy of this policy?

    Thanks again for your help.

Ms. Obiacoro emailed later that day, August 30, 2012 by attaching

a copy of the 2011 Summary Plan Description which she had

received from the Benefits Administrator, noting that the

Disability program info started on page 162.  Ms. Sessa replied

later that afternoon:

    Noreen,

    Thank you but I have the Summary Plan Description.  I have
    been told there is a detailed plan description for the Long
    term disability program.  That is what I have been trying to
    get for a while now.  In speaking with Aetna I was told that
    you were the person that would be able to provide me with
    this document.  Since I was enrolled in this plan, I am
    entitled to this policy description.

Apparently receiving neither a response nor a copy of the

requested document, Plaintiff again contacted Ms. Obiacoro on

September 4, 2012:

> Hi Noreen,
> I still have not receive [sic] the detailed plan description
> for the Aetna Long term Disability Plan I had while at Dell.
> When will you be able to provide me with this information?
>
> Thanks

Finally, some four hours later, Ms. Obiacoro provided the LTD

booklet via an email attachment. (Aetna 0707-0710). Plaintiff,

who was by then represented by counsel, filed her claims for both

short term disability and long term disability benefits with

Aetna on September 25, 2012. (Aetna 0376-0381, 0386, 0574, 1010-

1011, 1525, 1657).

Plaintiff's claim for STD benefits was initially denied on

October 17, 2012 on the grounds that Aetna had not received

previously requested (but not specified) information necessary to

its evaluation of Plaintiff's eligibility for benefits under the

plan provisions and, paradoxically, because Aetna had determined

that she was not eligible for benefits because her disability was

confirmed in or around April, 2012 and her claim was filed after

the last date worked. (Aetna 0449-0450).

Plaintiff appealed this denial and submitted additional

medical documentation in support, as well as the various

authorizations for disclosure of medical records and notes which

Aetna requested. (Aetna 0464-0469, 0523-A0524, 0650, 0689-0692).

The appeal was denied in a letter dated May 8, 2013 addressed to

Plaintiff's attorney. That letter read, in pertinent part:

We have completed our appeal review of the denial of STD

benefits for your client.  For the reasons detailed below,
the original decision to deny STD benefits, effective April
1, 2012, has been upheld.

Our records show that on September 25, 2012, your client
reported an absence from work beginning April 1, 2012.  STD
benefits were denied effective April 1, 2012.  These
benefits were denied due to ineligibility, late filing (170
days beyond April 9, 2012) and a lack of clinical
information to support an inability to perform the material
duties of your client's regular occupation as an outside
sales specialist prior to the termination of employment on
October 17, 2011.  Specifically, the information received
from the office of Dr. Lytton was not able to provide
specific physical examination findings which would preclude
your client from performing the material duties of your
client's regular occupation prior to October 17, 2011.

. . .

We completed a detailed review of the information provided
and gathered during the claim and appeal.  We received
multiple pieces of medical information dated after your
termination from the company (October 17, 2011). As
indicated above, your client stopped being eligible for
benefits effective October 17, 2011.  There is no
documentation on file to show that benefits were requested
prior to the date of termination.  In the information
received (dated prior to the termination from the company)
is office visit notes dated September 15, 2011, from Dr.
Lytton.  Your client was diagnosed with a cough, alteration
of awareness, and esophageal reflux.  Laboratory testing and
chest x-rays were ordered.  However, no recommendation to
remain out of work was indicated.  In addition, we have no
attendance records from the employer indicating that your
client was absent prior to the termination of employment.

. . .

(Aetna 0471-0472).

Plaintiff appealed the second denial on June 10, 2013 and

again provided new authorizations for release of medical records.

(Aetna 0473-0479).  By letter of July 23, 2013 to Plaintiff's

counsel, Aetna also denied the second level appeal.  Noting that

it had "received clinical information that addresses your
client's medical conditions and her approval for Social Security
Disability benefits," this time Aetna stated:

> ... Her claim was denied due to a lack of eligibility to
> participate in the Plan and not for functionality.
> Therefore, a clinical review of the medical information
> received was not completed with this appeal review.
>
> After review of the aforementioned information, we have
> determined your client is not eligible to receive STD
> benefits, due to her employment status as of October 18,
> 2011. Dell Inc. confirmed she was no longer employed.  The
> Dell Inc. STD Plan indicates participation ends when you are
> no longer employed by the Company.
>
> Therefore, the original decision to deny STD benefits,
> effective April 1, 2012, remains unchanged. ...

(Aetna 0480-0481).

Aetna dispensed with Plaintiff's claim for LTD benefits in
similar fashion.  Although its internal claims notes indicate
that it closed Plaintiff's claim on November 19, 2012 and it sent
Plaintiff a letter that same date requesting that additional
information be provided within thirty days, on December 5, 2012
Aetna sent a letter to Plaintiff's attorney in which it denied
the claim for long term disability benefits.  In so doing, Aetna
explained its reasons thusly:

> The file information states that the employee's first day
> absent from work was 04/1/2012.  However, we have confirmed
> that the employee were [sic] terminated from Dell Inc. on
> 10/17/2011.  Therefore, no benefits are payable for this
> claim.  Accordingly, your claim for disability benefits has
> been denied.

(Aetna 1014-1020, 1117-1118).

In response, on December 12, 2012, Plaintiff's attorney wrote a letter enclosing the previously requested information. On January 14, 2013, Plaintiff's counsel received a voice mail from the Aetna claims examiner indicating that the claim was still under review. (Aetna 1490-1491). Eventually, Plaintiff's counsel received a letter dated March 7, 2013 from Aetna indicating that it had completed review of Ms. Sessa's LTD claim and that it was again denying the claim because "she does not meet the definition of disability." (Aetna 1125). The letter went on to recite a partial history of the materials provided for review and Aetna's conclusion that "[t]he medical evidence received and reviewed does not demonstrate an impairment that would preclude Ms. Sessa from performing the core duties of her own occupation as an Outside Sales Specialist II." (Aetna 1126).

Plaintiff again appealed via letter dated May 13, 2013 which included additional information and documentation. (Aetna 1357-1365). Aetna thereafter issued its Final LTD Denial on July 25, 2013, this time giving as the reasons therefor that Plaintiff was ineligible for LTD coverage because she was not an employee when her claimed disability began, having been terminated in October of 2011, and because there was no evidence that she missed work on a continuous basis due to any disability. (Aetna 1142-1143).

Her appeals exhausted, Plaintiff filed her complaint in this matter. In the complaint, Plaintiff alleges that in denying her

benefits under the short term and long term disability plans,
Defendants acted arbitrarily and capriciously and breached their
fiduciary duties to her, thereby invoking the provisions of
Sections 404 and 502(a) of ERISA, 29 U.S.C. §§1104 and 1132(a).
In reliance solely on the materials contained in the records
reviewed by Defendants, all of the parties now move for the entry
of judgment in their favor as a matter of law.

## Summary Judgment Standards

The principles guiding the determination of motions for
summary judgment are clearly articulated in Fed. R. Civ. P. 56,
subsection (a) of which states:

> A party may move for summary judgment, identifying each
> claim or defense - or the part of each claim or defense - on
> which summary judgment is sought.  The court shall grant
> summary judgment if the movant shows that there is no
> genuine dispute as to any material fact and the movant is
> entitled to judgment as a matter of law.  The court should
> state on the record the reasons for granting or denying the
> motion.

Where the defendant is the moving party, the burden is on the
defendant to show that the plaintiff has failed to establish one
or more essential elements of her case.  Burton v. Teleflex,
Inc., 707 F.3d 417, 425 (3d Cir. 2013)(citing Hugh v. Butler
County Family YMCA, 418 F.3d 265, 267 (3d Cir. 2005)).  In all
cases, the initial burden is on the party seeking summary
judgment to point to the evidence which it believes demonstrates
the absence of a genuine issue of material fact.  Celotex Corp.
v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265

(1986); United States v. Donovan, 661 F. 3d 174, 185 (3d Cir. 2011).

The court reviewing a motion for summary judgment should view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. Id,(citing Scheidemantle v. Sluppery Rock University, State System of Higher Educ., 470 F.3d 535, 538 (3d Cir. 2006)). The line between reasonable inferences and impermissible speculation is often "thin," but is nevertheless critical because "an inference based upon a speculation or conjecture does not create a material factual dispute sufficient to defeat summary judgment." Halsey v. Pfeiffer, 750 F. 3d 273, 287 (3d Cir. 2014)(quoting Robertson v. Allied Signal, Inc., 914 F.2d 360, 382, n.12 (3d Cir. 1990) and Fragale & Sons Beverage Co. v. Dill, 760 F.2d 469, 474 (3d Cir. 1985)).

Inferences must flow directly from admissible evidence. Id. Further, an issue is genuine only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party, and a factual dispute is material only if it might affect the outcome of the suit under governing law. Kaucher v. County of Bucks, 455 F.3d 418, 423 (3d Cir. 2006)(citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)). In any event, to survive summary judgment, the non-moving party must present more than a mere

scintilla of evidence; there must be evidence on which the jury could reasonably find for the non-movant. Burton, supra,(quoting Jakimas v. Hoffman-LaRoche, Inc., 485 F.3d 770, 777 (3d Cir. 2007)).

These rules are no different where there are cross-motions for summary judgment. "Cross-motions are no more than a claim by each side that it alone is entitled to summary judgment, and the making of such inherently contradictory claims does not constitute an agreement that if one is rejected the other is necessarily justified or that the losing party waives judicial consideration and determination whether genuine issues of material fact exist." Lawrence v. City of Philadelphia, 527 F.3d 299, 310 (3d Cir. 2008)(quoting Rains v. Cascade Industries, Inc., 402 F.2d 241, 245 (3d Cir. 1968)). The mere fact that both parties seek summary judgment does not constitute a waiver of a full trial or the right to have the case presented to a jury. Facenda v. N.F.L. Films, Inc., 542 F.3d 1007, 1023 (3d Cir. 2008).

## **Discussion**

*A. Legal Principles*

It has been observed that Congress enacted ERISA "to promote the interests of employees and their beneficiaries in employee benefit plans," "to protect contractually defined benefits," and "to ensure the proper administration of pension and welfare

plans, both during the years of the employee's active service and in his or her retirement years.  National Security Systems, Inc. v. Iola, 700 F.3d 65, 81-82 (3d Cir. 2012)(quoting Boggs v. Boggs, 520 U.S. 833, 117 S. Ct. 1754, 138 L. Ed. 2d 45 (1997)); Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 113, 109 S. Ct. 942, 956, 103 L. Ed. 2d 80 (1988)(quoting Massachusetts Mutual Life Ins. Co. v. Russell, 473 U.S. 134, 148, 105 S. Ct. 3085, 3093, 87 L. Ed. 2d 96 (1985) and Shaw v. Delta Airlines, Inc., 463 U.S. 85, 90, 103 S. Ct. 2890, 2896, 77 L. Ed. 2d 490 (1983)).

To that end ERISA, which has been described as a "comprehensive and reticulated statute," provides a "carefully crafted and detailed enforcement scheme."  Central States, S.E. and S.W. Areas Health & Welfare Fund v. Bollinger, Inc., No. 13-3924, 573 Fed. Appx. 197, 199, 2014 U.S. App. LEXIS 13448 at *8 (3d Cir. July 15, 2014)(quoting Mertens v. Hewitt Assocs., 508 U.S. 248, 254, 113 S. Ct. 2063, 2067, 124 L. Ed. 2d 161 (1993)). The statute applies to "any employee benefit plan if it is established or maintained by any employer engaged in commerce." 29 U.S.C. §1003(a).  More particularly, it defines an employee welfare benefit plan as "any plan, fund or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that such plan, fund, or program was established or is

maintained for the purpose of providing certain benefits for its participants or their beneficiaries through the purchase of insurance or otherwise."  <u>Menkes v. Prudential Insurance Co. of America</u>, 762 F.3d 285, 290 (3d Cir. 2014)(quoting 29 U.S.C. §§1002(1), 1003(a)).

ERISA's "integrated system of procedures for enforcement," is codified in Section 502 of the statute, 29 U.S.C. §1132. <u>Aetna v. Davila</u>, <u>supra</u>,(quoting <u>Massachusetts Mutual v. Russell</u>, 473 U.S. at 147, 105 S. Ct. at 3093).  Indeed, Plaintiff here premises her claims upon subsections (a)(1),(2) and (3) of this Section, which provides as follows in relevant part:

**§1132.  Civil enforcement**

**(a) Persons empowered to bring a civil action.**  A civil action may be brought -

> (1) by a participant or beneficiary -
>
> (A) for the relief provided for in subsection (c) of this section, or
>
> (B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan;
>
> (2) by the Secretary, or by a participant, beneficiary or fiduciary for appropriate relief under section 409[1]

---

[1] Section 409, 29 U.S.C. §1109 governs claims for breach of fiduciary duty, which Plaintiff here also raises:

**§1109.  Liability for breach of fiduciary duty**

(a) Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this title shall be personally liable to make good to

[29 U.S.C. §1109];

> (3) by a participant, beneficiary or fiduciary (A) to enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (I) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan; ...

To make out a claim under Section 502(a)(1)(B), "a plan participant must demonstrate that 'he or she has a right to benefits that is legally enforceable against the plan,' and that the plan administrator improperly denied those benefits." Fleisher v. Standard Insurance Co., 679 F.3d 116, 120 (3d Cir. 2012)(quoting Hooven v. Exxon Mobile Corp., 465 F.3d 566, 574 (3d Cir. 2006)).

ERISA also requires each plan to have one or more named fiduciaries that are granted the authority to manage the operation and administration of the plan. Renfro v. Unisys Corp., 671 F.3d 314, 321 (3d Cir. 2011)(citing 29 U.S.C. §1002(a)(1)). Under the statute's definition, "... a person is a fiduciary with respect to a plan to the extent

---

such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary. A fiduciary may also be removed for a violation of section 411 of this Act [29 U.S.C. §1111].

(b) No fiduciary shall be liable with respect to a breach of fiduciary duty under this title if such breach was committed before he became a fiduciary or after he ceased to be a fiduciary.

(I) he exercises any discretionary authority or
discretionary control respecting management of such plan or
exercises any authority or control respecting management or
disposition of its assets,

(ii) he renders investment advice for a fee or other
compensation, direct or indirect, with respect to any moneys
or other property of such plan, or has any authority or
responsibility to do so, or

(iii) he has any discretionary authority or discretionary
responsibility in the administration of such plan.  Such
term includes any person designated under section
1105(c)(1)(B)of this title.

Id,(quoting 29 U.S.C. §1002(21)(A)).  Thus, "[t]he statute

provides that not only the persons named as fiduciaries by a

benefit plan, ... but also anyone else who exercises

discretionary control or authority over the plan's management,

administration, or assets, ... is an ERISA 'fiduciary.'" Mertens,

508 U.S. at 251, 113 S. Ct. at 2066 (citing 29 U.S.C.

§1002(21)(A)).

"This so-called 'functional' fiduciary duty is contextual -

it arises 'only to the extent' a person acts in an

administrative, managerial, or advisory capacity to an employee

benefits plan," and "[t]hus, 'the threshold question is not

whether the actions of some person employed to provide services

under a plan adversely affected a plan beneficiary's interest,

but whether that person was acting as a fiduciary (performing a

fiduciary function) when taking the action subject to

complaint.'" Santomenno v. John Hancock Life Insurance Co., 768

F.3d 284, 291 (3d Cir. 2014)(quoting Pegram v. Herdrich, 530 U.S.

211, 222, 120 S. Ct. 2143, 147 L. Ed. 2d 164 (2000)). Hence, an

employer can also function as an ERISA "fiduciary." See, Varity

Corp. v. Howe, 516 U.S. 489, 503, 116 S. Ct. 1065, 1073, 134 L.

Ed. 2d 130 (1996).

"Under Section 404(a)[2], 'a fiduciary shall discharge his

duties with respect to a plan solely in the interest of the

participants and beneficiaries and for the exclusive purpose of

defraying reasonable expenses of administering the plan.'" Danza

v. Fidelity Management Trust Co., 533 Fed. Appx. 120, 123, 2013

U.S. App. LEXIS 15751 at *5 (3d Cir. July 29, 2013)(quoting 29

---

[2] Section 404(a), 29 U.S.C. §1104(1) reads as follows in pertinent
part:

**§1104. Fiduciary duties**

**(a) Prudent man standard of care.** (1) Subject to sections 403(c), and
(d), 4042, and 4044 [29 U.S.C. §1103(c), (d), 1342, 1344], a fiduciary
shall discharge his duties with respect to a plan solely in the interest
of the participants and beneficiaries and -

> (A) for the exclusive purpose of:
>
> > (I) providing benefits to participants and their
> > beneficiaries; and
> >
> > (ii) defraying reasonable expenses of administering the
> > plan;
>
> (B) with the care, skill, prudence, and diligence under the
> circumstances then prevailing that a prudent man acting in a like
> capacity and familiar with such matters would use in the conduct
> of an enterprise of a like character and with like aims;
>
> > ...
>
> (D) in accordance with the documents and instruments governing the
> plan insofar as such documents and instruments are consistent with
> the provisions of this title and title IV.
>
> > ...

U.S.C. §1004(a)).  "Section 404 in essence codifies a common law
fiduciary's general duty of loyalty..."  Id.  Further, "[i]t is
well-established that an ERISA fiduciary 'may not materially
mislead those to whom section 1104(a)'s duties of loyalty and
prudence are owed.'"  Edgar v. Avaya, Inc., 503 F.3d 340, 350 (3d
Cir. 2007)(quoting Unisys Sv. Plan Litig., 74 F.3d 420, 440 (3d
Cir. 1996)).  "Indeed, 'the duty to inform is a constant thread
in the relationship between beneficiary and trustee; it is not
only a negative duty not to misinform, but also an affirmative
duty to inform when the trustee knows that silence might be
harmful.'"  Id.  And, "[w]hen a plan administrator speaks, it must
speak truthfully."  Fischer v. Philadelphia Electric Co., 96 F.3d
1533, 1538 (3d Cir. 1996).

That an individual plan participant or beneficiary may
maintain a claim for breach of fiduciary duty on his or her own
behalf is now well and firmly established.  Indeed on this point,
the Supreme Court has held: "[t]he words of subsection (3) -
'appropriate equitable relief' to 'redress' any 'act or practice
which violates any provision of this title' - are broad enough to
cover individual relief for breach of a fiduciary obligation."
Varity, 516 U.S. at 510, 116 S. Ct. at 1076.  The Third Circuit
has similarly reasoned: "Section 502(a)(3) authorizes the award
of 'appropriate equitable relief' directly to a participant or
beneficiary to 'redress *any* act or practice which violates *any*

provision of this title'" including a breach of the statutorily created fiduciary duty of an administrator.'" <u>Bixler v. Central Pa. Teamsters Health-Welfare Fund</u>, 12 F.3d 1292, 1298 (3d Cir. 1993)(quoting Justice Brennan's concurrence in <u>Massachusetts Mutual Life Insurance Co. v. Russell</u>, 473 U.S. 134, 105 S. Ct. 3085, 87 L. Ed. 2d 96 (1985))(emphasis in original).

Given that "an administrator/employer has a duty to 'convey complete and accurate information material to the beneficiary's circumstance even if that information comprises elements about which the beneficiary has not specifically inquired,'"(<u>Peterson v. AT & T Co.</u>, No. 04-2213, 127 Fed. Appx. 67, 71, 2005 U.S. App. LEXIS 5367 at *11 (3d Cir. April 4, 2005)(quoting <u>Bixler</u>, 12 F.3d at 1300)) a breach of fiduciary duty claim may be premised on either a misrepresentation or an omission.  <u>In re Unisys Corp. Retiree Medical Benefits ERISA Litigation</u>, 579 F.3d 220, 228 (3d Cir. 2009).  "To establish such a breach, a plaintiff must demonstrate: (1) the defendant was 'acting in a fiduciary capacity;' (2) the defendant made 'affirmative misrepresentations or failed to adequately inform plan participants and beneficiaries;' (3) the misrepresentation or inadequate disclosure was material; and (4) the plaintiff detrimentally relied on the misrepresentation or inadequate disclosure." <u>Id</u>,(quoting <u>Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am., U.A.W. v. Skinner Engine Co.</u>, 188 F.3d

130, 148 (3d Cir. 1999)).

Notwithstanding all that it *does* say, surprisingly the ERISA statute itself does *not* specify the appropriate standard of review for actions under §1132(a)(1)(B) challenging benefit eligibility determinations.  <u>Firestone</u>, 489 U.S. at 108-109, 109 S. Ct. at 953.  Again applying trust law principles to fill this statutory void and recognizing that the proper standard of review of a trustee's decision typically depends on the language of the instrument creating the trust, the Supreme Court has decreed that a denial of benefits challenged under this section is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan.  <u>Conkright v. Frommert</u>, 559 U.S. 506, 512, 130 S. Ct. 1640, 1646, 176 L. Ed. 2d 469, 475 (2010); <u>Firestone</u>, 489 U.S. at 115, 109 S. Ct. at 956-957.  "If the trust documents give the trustee 'power to construe disputed or doubtful terms, the trustee's interpretation will not be disturbed if reasonable.'" <u>Conkright</u>, <u>supra</u>, (quoting <u>Firestone</u>, 489 U.S. at 111-112). Stated otherwise, when the benefit plan gives the administrator discretionary authority, that determination is entitled to deference and is reviewed only for abuse of that discretion.[3]

---

[3]   In the context of ERISA, the arbitrary and capricious and abuse of discretion standards of review are essentially the same and are therefore used interchangeably when referring to the deferential standard of review.

Howley v. Mellon Financial Corp., 625 F.3d 788, 792 (3d Cir. 2010); Doroshow v. Hartford Life & Accident Insurance Co., 574 F.3d 230, 233 (3d Cir. 2009).

Often, however, "the entity that administers the plan, such as an employer or an insurance company, both determines whether an employee is eligible for benefits and pays benefits out of its own pocket." Metropolitan Life Insurance Co. v. Glenn, 554 U.S. 105, 128 S. Ct. 2343, 2346, 171 L. Ed. 2d 299 (2008). The Supreme Court has found that such a dual role creates a conflict of interest and has held that, where presented, a reviewing court must consider that conflict as a factor in ascertaining whether a plan administrator has abused its discretion in denying benefits and that the significance of the factor will depend upon the circumstances of the particular case. Id, (citing Firestone, 489 U.S. at 115, 109 S. Ct. at 957). In conducting a review of an administrator/fiduciary's decision, the following four principles are relevant and properly applied:

> (1) In "determining the appropriate standard of review," a court should be "guided by principles of trust law"; in doing so, it should analogize a plan administrator to the trustee of a common-law trust; and it should consider a benefit determination to be a fiduciary act (*i.e.*, an act in which the administrator owes a special duty of loyalty to the plan beneficiaries).

Fleischer, 679 F.3d at 121, n.2 (citing Miller v. American Airlines, Inc., 632 F.3d 837, 845, n.2 (3d Cir. 2011)). "An administrator's decision is arbitrary and capricious 'if it is without reason, unsupported by substantial evidence or erroneous as a matter of law.'" Id, (quoting Abnathya v. Hoffman-LaRoche, Inc., 2 F.3d 40, 45 (3d Cir. 1993)).

(2) Principles of trust law require courts to review a denial of plan benefits "under a *de novo* standard" unless the plan provides to the contrary.

(3) Where the plan provides to the contrary by granting "the administrator or fiduciary *discretionary authority* to determine eligibility for benefits, trust principles make a *deferential standard* of review appropriate."

(4) If "a benefit plan gives discretion to an administrator or fiduciary who *is operating under a conflict of interest,* that conflict must be *weighed as a factor* in determining whether there is an abuse of discretion." (Emphasis in original).

Glenn, 128 S. Ct. at 2347-2348 (quoting Firestone, 489 U.S. at

111-115, 109 S. Ct. at 948) and citing, *inter alia,* Davila, 542

U.S. at 218, Central States, Southeast & Southwest Areas Pension

Fund v. Central Transport, Inc., 472 U.S. 559, 570, 105 S. Ct.

2833, 86 L. Ed. 2d 447 (1985), and W. Fratcher, *Law of Trusts*

§201, p. 221 (4th ed. 1988)); Serbanic v. Harleysville Life

Insurance Co., Nos. 08-1059, 08-1157, 325 Fed. Appx. 86, 89, 2009

U.S. App. LEXIS 9302 at *5 (3d Cir. April 30, 2009).

In this case, the ERISA plan at issue is the "Dell Inc.

Comprehensive Welfare Benefits Plan, as amended and restated

effective January 1, 2011." (Exhibit "B" to Plaintiff's Motion

for Summary Judgment ("MSJ"), Dell-00001). Under Article I, the

Definitions section,

**1.3. Administrator.** "Administrator" means the Company or the committee appointed by the Company to supervise the administration of the Plan. The Dell Inc. Benefits Administration Committee will be the named fiduciary for purpose of ERISA Section 402(a)(1) with respect to all duties and powers assigned to it under the Plan and will be responsible for complying with all reporting and disclosure

requirements of Part I of Subtitle B of Title I of ERISA, except and to the extent such named fiduciary status with respect to specified duties and powers are assigned to a Claims Administrator or other third party that is designated as the named fiduciary for purposes of the Plan or the applicable Component Plan in writing by the Administrator. To the extent that a Claims Administrator or other third party is so designated as the named fiduciary, any reference by the Plan or the Schedule of Benefits to the duties or powers of the Administrator shall actually be a reference to that designated party.

**1.8. Claims Administrator.** "Claims Administrator" means the Administrator or such other person designated in the Plan and the applicable Component Plan as the Claims Administrator or in a written agreement entered into pursuant to the Plan to administer claims or perform any other responsibility assigned under the Plan to the Claims Administrator. The Claims Administrator shall be the named fiduciary for purposes of ERISA Section 402(a)(1) with respect to all duties and powers assigned to it under the Plan or any written agreement entered into pursuant thereto.

(Exhibit "B," Dell- 000007, 000008)

Article V, in turn governs administration of the plan.

Under §5.1:

The general administration of the Plan and the duty to carry out its provisions shall be vested in the Administrator. The Dell Inc. Benefits Administration Committee (the "Committee") shall be the named fiduciary of the Plan for purposes of ERISA with respect to all matters other than those with respect to which named fiduciary status otherwise is assigned to another party under the terms of the Plan or in a written agreement entered into pursuant to the Plan.

(Exhibit "B," Dell-000064).

The Short Term and Long Term Disability Plans are "Component Plans" under the Plan, meaning that each is "a particular portion of the Plan that provides a specific set of benefits, coverages, terms and other provisions that are intended to be reflected

26

within the Plan[,]" such that "[e]ach ... is not a separate employee welfare benefit plan but rather is maintained herein as part of the Plan." (Exhibit "B," Dell-000010).

B. *Denial of Short Term Disability Benefits*

The Short Term Disability Plan, which is sponsored and maintained by Dell, states that the "Disability Claims Administrator" "means the Administration Committee or the person so designated by a majority of the Administration Committee." (Plaintiff's MSJ Exhibit "B" at Appendix "G," §§1.1, 2.12, Dell-000276, 000278). The Short Term Disability ("STD") Plan further provides that:

> The Disability Claims Administrator shall have the exclusive authority to determine, in its sole discretion, whether the Participant has sustained a Physical Disability, when the Physical Disability first occurred and when the Physical Disability ends on the basis of relevant information that the Disability Claims Administrator deems relevant to such determination, including, but not limited to, objective medical evidence and a physical examination. The Disability Claims Administrator may require a Participant to submit to a physical by a Physician or other healthcare professional chosen by the Disability Claims Administrator in order to confirm Physical Disability or to provide such other evidence or information as it deems appropriate.

(Appendix "G," §2.29, Dell-000281). Pursuant to a Master Relationship Agreement effective January 1, 2009, Dell and Aetna agreed that Aetna would serve as the Disability Claims Administrator for Dell's STD Plan. (Defendants' Supplemental Administrative Record (Aetna 0317-0373). Section 7.13 of that Agreement reads as follows:

It is understood and agreed that Dell retains complete
authority and responsibility for the Plan, its operation,
and the benefits provided hereunder, and that Provider is
empowered to act on behalf of Dell in connection with the
Plan only to the extent expressly stated in the Agreement or
as agreed to in writing by Provider and Dell.

Dell and Provider agree with respect to Section 503 of the
Employee Retirement Income Security Act of 1974, as amended,
Provider will be the "appropriate named fiduciary" of the
Plan for purpose of reviewing claims and claims appeals
under the Plan.  In exercising such fiduciary
responsibility, Provider will have discretionary authority
to determine entitlement to Plan benefits as determined by
the Plan Documents for each claim received and to construe
the terms of the Plan.  However, Dell has the sole and
complete authority to determine eligibility of persons to
participate in the Plan.  It is also agreed that Provider's
decision on any claim is final and that Provider has no
other ERISA fiduciary responsibility under the Plan.

(Defendant's Supplemental Administrative Record, Aetna 0320).

 Thus, under the wording of the STD Plan, Dell as the

administrator or fiduciary has discretionary authority to

determine eligibility for benefits or to construe the terms of

the plan and, under the MRA, Dell has granted to Aetna the

discretionary authority to determine entitlement to Plan benefits

and to construe the Plan's terms.  We therefore view Aetna's

decision with respect to Plaintiff's claim for benefits under the

STD Plan using the arbitrary and capricious standard and/or for

abuse of discretion.

     As noted previously, Plaintiff applied for both short term

and long term disability benefits on September 25, 2012, nearly

one year after the date on which she was terminated from her

employment with Dell.  Her claim for short term disability

benefits was first denied via letter from Aetna dated October 17,

2012 for two reasons: (1) Aetna had "not received previously

requested information necessary to our evaluation of your

eligibility for benefits under the plan provisions"; and (2) she

was not eligible for benefits because she had been terminated

from the company before filing the claim.  Aetna further noted

"per attorney letter dated 10/4/2012 your diagnosis was confirmed

in or around April, 2012.  As this is after your date of

termination, you are no longer considered eligible."  (Aetna

0449-0454).  Plaintiff appealed but on May 8, 2013, the appeal

was denied and the original decision upheld.  This letter gave as

the reasons therefore:

> Our records show that on September 25, 2012, your client
> reported an absence from work beginning April 1, 2012.  STD
> benefits were denied effective April 1, 2012.  These
> benefits were denied due to ineligibility, late filing (170
> days beyond April 9, 2012), and a lack of clinical
> information to support an inability to perform the material
> duties of your client's regular occupation as an outside
> sales specialist prior to the termination of employment on
> October 17, 2011.  Specifically, the information received
> from the office of Dr. Lytton was not able to provide
> specific physical examination findings which would preclude
> your client from performing the material duties of your
> client's regular occupation prior to October 17, 2011.
>
>           ...
>
> We completed a detailed review of the information provided
> and gathered during the claim and appeal.  We received
> multiple pieces of medical information dated after your
> termination from the company (October 17, 2011).  As
> indicated above, your client stopped being eligible for
> benefits effective October 17, 2011.  There is no

documentation on file to show that benefits were requested
prior to the date of termination.  In the information
received (dated prior to the termination from the company)
is office visit notes dated September 15, 2011 from Dr.
Lytton.  Your client was diagnosed with a cough, alteration
of awareness and esophageal reflux.  Laboratory testing and
chest x-rays were ordered.  However, no recommendation to
remain out of work was indicated.  In addition, we have no
attendance records from the employer indicating that your
client was absent prior to the termination of employment.
...

(Aetna 0471-0472).

In response to this, Plaintiff took a second-level appeal.

On July 23, 2013, Aetna issued its final decision with respect to

Plaintiff's short-term disability claim.  Again upholding the

denial, this time Aetna stated:

Our records show the first date your client was absent from
work was April 1, 2012.  Your client's STD benefits were
denied, effective April 1, 2012, as she was no longer an
employee of Dell Inc.  As such, she was not eligible to
participate in the Plan.

Aetna received notification of your client's claim for
disability on September 25, 2012.  We received notification
from Dell Inc. that Ms. Sessa's employment ended on October
18, 2011.  She last worked on October 17, 2011.
Additionally, you confirmed your client's employment status
in your appeal request letter.  We received clinical
information that addresses your client's medical conditions
and her approval for Social Security Disability Benefits.
Her claim was denied due to a lack of eligibility to
participate in the Plan and not for functionality.
Therefore, a clinical review of the medical information
received was not completed with this appeal review.

After review of the aforementioned information we have
determined your client is not eligible to receive STD
benefits, due to her employment status of as October 18,
2011.  Dell Inc. confirmed she was no longer employed.  The
Dell Inc. STD Plan indicates participation ends when you are
no longer employed by the Company.

Therefore, the original decision to deny STD benefits, effective April 1, 2012, remains unchanged.

(Aetna 0480-0481).

Obviously, there are numerous inconsistencies between these three letters at least insofar as the reasoning underlying the denial of the claim is concerned. We find particularly confusing Aetna's references to April 1, 2012 as Plaintiff's first date of absence from work when all of the record evidence reflects that Plaintiff was terminated on October 17, 2011, effective immediately.[4] This confusion notwithstanding, the STD Plan provides in relevant part that any Dell employee who is working more than 25 hours per week and is not a member of a collective bargaining unit without an agreement for coverage under the Plan automatically becomes a "participant" upon completion of thirty consecutive calendar days of full-time employment. (Pl's Exhibit "B," Appendix "G," Dell-000279). "A Participant will cease to be a Participant on ...[t]he date on which the Participant's employment with his Employer terminates..." (Appendix "G," §3.2(a), Dell-000283). For physical disability claims, "[a] Participant must provide notice of claim to the Disability Claims Administrator or its designated representative no later than eight calendar days after the date the Participant becomes

---

[4] While it appears that Plaintiff notified Dell that her multiple sclerosis diagnosis had recently been confirmed in an email sent on April 2, 2012, this was certainly not her first day absent from work.

Physically Disabled."  (Appendix "G," §7.1(a), Dell-000293).
"Disability" is defined as "a Physical Disability or a Mental
and/or Behavioral Health Disability.  A Disability must be
substantiated by significant objective findings which are defined
as signs noted on a medical examination or test and considered
significant anatomical, physiological or psychological
abnormalities which can be observed apart from the symptoms. ..."
(Appendix "G," §2.10, Dell-000278).  A "Disabled Employee" is "an
Employee who demonstrates to the satisfaction of the Disability
Claims Administrator, in its exclusive discretion, that he (I)
ceased to be Employed Full-Time by an Employer solely because he
became Disabled, and (ii) presently is not Employed Full-Time
solely because he is Disabled."  Appendix "G," §2.12, Dell-
000278).

        In addition to pointing out the "nonsensical" nature of
Aetna's denial letters and the fact that Aetna's initial denial
came less than two weeks after it requested additional but
unspecified information, Plaintiff asserts that the alleged
reasons for denying her claim, particularly the implied
requirement that her diagnosis be confirmed while still an
employee, have no basis in the language of the Plan or anywhere
else and therefore Aetna abused its discretion in denying her
short term disability benefits.

        Although we would agree that we could find no mention in the

Plan documents requiring confirmation of a Participant's diagnosis prior to separation from employment as a pre-requisite to coverage, we cannot agree that the Administrator's (Aetna's) decision is without reason, unsupported or erroneous as a matter of law. See, *e.g*., Miller, 632 F.3d at 845. Rather, after examining all of the denial letters in conjunction with the Plan documents, it appears clear that the true reason underlying the decision to deny Plaintiff short term disability benefits is that she was no longer a "participant" within the meaning of Article III of the Plan when she filed her claim for those benefits and was therefore no longer eligible to receive them under Section 4.1 of the Plan, having been terminated from her employment nearly one year prior to filing her claim.[5]  This interpretation of the Plan is, we find, a reasonable one and in making it and in denying Plaintiff's claim for benefits on this basis, Aetna did not abuse its discretion.  We shall therefore deny Plaintiff's and grant Defendants' motions for summary judgment with respect to Count I of Plaintiff's complaint.

    *C. Denial of Long Term Disability Benefits*

    The Long-Term Disability Plan, on the other hand, is part of a Group Insurance Policy underwritten by Aetna and offered to

---

[5]  In addition, it also appears from the record that Plaintiff did not satisfy the requirement set forth in §7.1(a) that she provide notice of the claim to the Disability Claims Administrator or its designated representative no later than 8 calendar days after the date she became physically disabled. (Appendix "G," Dell-000293).

Dell employees as part of the overall Comprehensive Welfare Benefits Plan. (Plaintiff's Exhibit "B," Appendix "H," Dell 000307, Aetna 0293). With the exception of determining the criteria that are used to define what employees are eligible to apply for long term disability coverage (*i.e.* eligible employee class), Aetna is charged with making all of the other decisions with respect to whether and when long term disability benefits are payable under this policy. (Appendix "H," Dell-000304-000365). Indeed, with regard to, *inter alia*, the LTD Component, the Policy provides in pertinent part:

> For the purpose of Section 503 of Title I of the Employee Retirement Income Security Act of 1974, as amended (ERISA), We [Aetna] are a fiduciary with complete authority subject to Texas and Federal law, to review all denied claims for benefits under this Policy. ... In exercising such fiduciary responsibility, [Aetna] shall have discretionary authority to determine whether and to what extent eligible employees and beneficiaries are entitled to benefits and to construe any disputed or doubtful terms under this Policy, the Certificate or any other document incorporated herein. [Aetna] shall be deemed to have properly exercised such authority unless [Aetna] abuse[s] [its] discretion by acting arbitrarily and capriciously. [Aetna] has the right to adopt reasonable policies, procedures, rules and interpretations of this Policy to promote orderly and efficient administration.

(Aetna 0306, Dell-000427). Consequently, while we review Aetna's benefits decisions with regard to the LTD policy under the abuse of discretion standard, we properly consider that any benefits which may be payable are coming from Aetna's own pocket.

Again the administrative record in this matter reflects that Aetna first denied Plaintiff's claim for long term disability

benefits in a letter dated December 5, 2012.  After noting that

"[t]o qualify for disability benefits under the plan, the

employee must be a full time employee and must be actively at

work at the time their disability began, Aetna went on to say:

> The file information states that the employee's first day
> absent from work was 04/1/2012.  However, we have confirmed
> that the employee were [sic] terminated from Dell Inc. on
> 10/17/2011.  Therefore, no benefits are payable for this
> claim.  Accordingly, your claim for disability benefits has
> been denied.

(Aetna 1117-1118).

In addition to filing an appeal, on December 12, 2012,

Plaintiff's attorney wrote a letter enclosing additional,

previously requested information.  On January 14, 2013,

Plaintiff's counsel received a voice mail from the Aetna claims

examiner indicating that the claim was under review.  (Aetna

1490-1491).  On March 7, 2013, Aetna issued a letter indicating

that it had completed review of Ms. Sessa's LTD claim and that it

was again denying the claim because "she does not meet the

definition of disability."  (Aetna 1125).  Noting that a claimant

meets the "test of disability on any day that you cannot perform

the material duties of your own occupation solely because of an

illness, injury or disabling pregnancy-related condition and,

your earnings are 80% or less of your adjusted predisability

earnings," Aetna's letter went on to recite a partial history of

the materials provided for review and Aetna's conclusion that

"[t]he medical evidence received and reviewed does not

demonstrate an impairment that would preclude Ms. Sessa from performing the core duties of her own occupation as an Outside Sales Specialist II." (Aetna 1125-1126).

Plaintiff again appealed via letter dated May 13, 2013 which included additional information and documentation. (Aetna 1357-1365). Aetna thereafter issued its Final LTD Denial on July 25, 2013, this time giving as the reasons therefor:

> Our records show that Ms. Sessa's last day worked was October 17, 2011, and the first date of her absence from work was April 1, 2012. Ms. Sessa's request for LTD benefits was denied as Aetna determined that she was not eligible for LTD coverage due to the termination of her employment in October of 2011. Information received reflects your client's first date of absence was April 1, 2012. Dell has confirmed that Ms. Sessa's last day worked was October 17, 2011 which was well before the onset of her absence from work due to her claimed disability.
>
> We received clinical information that addresses your client's condition. We also received confirmation that your client has been approved for Social Security Disability. By letter, dated December 5, 2012, we advised that Ms. Sessa was ineligible for LTD coverage as she was not an employee when her claimed disability began. We sent another letter to you on March 7, 2013, in which we advised that clinical review revealed Ms. Sessa was not impaired from performing the material duties of her own occupation prior to the onset of her claimed disability. On appeal, we have determined that Ms. Sessa did not meet the requirements for eligibility as of beginning of her absence from work resulting from her claimed disability. Therefore, an assessment of her functional abilities for purposes of determining whether she was disabled as defined by the LTD policy was not necessary for completion of the appeal review process.
>
> After review of the aforementioned information it has been determined your client does not meet the eligibility requirement for LTD benefits because she was not a covered employee at the time she became disabled. Her employment ceased prior to the onset of her claimed disability. Although there was some evidence presented that Ms. Sessa

> sustained an injury prior to the end of her employment and
> that she received treatment following this injury, there was
> no indication that she missed work on a continuous basis due
> to any disability.  During this time and until her
> separation from employment, she continued to receive at
> least 80% of her predisability income.

. . .

(Aetna 1142-1143).

Again, putting aside for the moment the absurdity of the
first sentence suggesting that Plaintiff's first day of absence
from work came more than five months after her termination, after
reviewing each of the denial letters and the entire
administrative record in this matter we frankly are hard-pressed
to understand the basis for Aetna's denial.  Indeed, the record
reflects that the Plaintiff began experiencing significant
symptoms of disorientation, memory loss, anxiety, heartburn and
nausea in or around August, 2011.  Although at the end of May,
2011, Plaintiff apparently hit her head while power washing under
her deck, "she did not think much of it."  (Aetna 0564).  On
September 15, 2011 Plaintiff saw Dr. Lytton, her family doctor,
with complaints of memory loss, chest tightness, difficulty
reading things and not absorbing what she read, feeling "stupid,"
"weird," and "funky," especially when she stood up; her head felt
like it was "in a bubble," she felt feverish for a few nights,
but without a fever, and she reported that she had gained 20
pounds over the past year, but without eating any more.  Ms.
Sessa also complained of fatigue and reported that she had gotten

on the expressway going in the wrong direction, that she had had dinner with an old boss who said she needed to get evaluated and that she had gotten written up at work for a poor presentation - she had apparently stumbled on and forgotten words. She feared she had dementia. (Aetna 0626-0627, 0774). Dr. Lytton determined that Plaintiff then had a cough, transient alteration of awareness, esophageal reflux and nondependent tobacco use disorder, and she ordered a full battery of laboratory and other testing for plaintiff and prescribed Omeprazole for the esophageal reflux. (Aetna 0627).

Plaintiff returned to Dr. Lytton for follow-up on September 19, 2011, at which time she was also diagnosed with allergic rhinitis due to pollen, acute maxillary sinusitis and dysfunction of the eustachian tube. Prescriptions for Augmentin and Flonase were given and Dr. Lytton referred Plaintiff to several specialists, including a gastroenterologist and an ear, nose and throat specialist. Plaintiff saw the ENT, Dr. Ardito, on October 4, 2011. Upon receiving the results from a tympanogram, Dr. Ardito tentatively diagnosed Plaintiff as suffering from vestibular disorder and prescribed additional, stronger antibiotics. (Aetna 0693-0694). Plaintiff continued to have cognitive problems synthesizing her thoughts and performance, intermittent visual complaints and some vague intermittent ear pain but at her follow-up appointment with Dr. Ardito on October

18, 2011, he was of the opinion that she had a neurologic problem and not an otologic one. (Aetna 0716). He recommended that she see a neurologist.

Ms. Sessa promptly did so. On October 26, 2011, she came under the care of neurologist Fred Weinblatt, M.D. At that time, she reported complaints of feeling unfocused, fullness in her ear, imbalance, stammering in her speech and anxiety. In his examination that day, Dr. Weinblatt found that Plaintiff was mildly tremulous, her speech was a "bit pressured," she had mild difficulty with tandem gait, her reflexes were suppressed at her knees, repressed at her ankles, her toes were down going, and her Romberg testing was not positive.[6] Dr. Weinblatt ordered additional laboratory testing of Plaintiff's B12 level, and a Lyme titer along with an MRI of the brain with and without contrast dye. (Aetna 0735-0736). On October 28, 2011, Plaintiff underwent the MRI which revealed "[m]ultifocal predominately periventricular T2 hyperintensities that have an appearance and

---

[6]   According to Wikipedia,

   "Romberg's test is a test used in an exam of neurological
   function." [It is] "a test of the body's sense of positioning
   (proprioception) which requires healthy functioning of the dorsal
   columns of the spinal cord. The Romberg test is [also] used to
   investigate the cause of loss of motor coordination (ataxia). A
   positive Romberg test suggests that the ataxia is sensory in
   nature, that is, depending on loss of proprioception. If a
   patient is ataxic and Romberg's test is not positive, it suggests
   that ataxia is cerebellar in nature, that is, depending on
   localized cerebellar dysfunction instead."

distribution typical of demyelinating disease."[7]  (Aetna 0642, 0755).  Thereafter, at her follow-up appointment on November 4, 2011, although he ordered still further testing to confirm, Dr. Weinblatt diagnosed Ms. Sessa with probable multiple sclerosis. (Aetna 0730, 0732-0734).

In the months immediately following, the plaintiff continued to undergo numerous tests and scans of virtually her entire body. She subsequently also saw two other neurologists for second and third opinions regarding her diagnosis.  On November 14, 2011, Plaintiff saw Dr. Thomas P. Leist, the Director of the Multiple Sclerosis Center at Thomas Jefferson University Hospital.  At that visit, Plaintiff related complaints of being unable to learn and retain new material, a feeling of dizziness and fullness in her ears, and frequently loose bowel movements.  In his examination, Dr. Leist noted that Ms. Sessa had a hint of left lower facial weakness, that she was slow in performing point to point movements, though he did not feel that was demonstrative of clear cerebellar characteristics.  Based on her patient history and the location of the brain lesions as shown on her MRI which were appropriate for MS, Dr. Leist nevertheless opined that it was "more difficult to entertain a clear diagnosis of multiple

_____

[7] "A demyelinating disease is any condition that results in damage to the protective covering (myelin sheath) that surrounds nerve fibers in the brain and spinal cord.  When the myelin sheath is damaged, nerve impulses slow or even stop, causing neurological problems.  Multiple sclerosis is the most common demyelinating disease of the central nervous system." www.mayoclinic.org/demyelinating-disease/expert-answers).

sclerosis in her," and he recommended that Plaintiff undergo additional work-ups including, *inter alia*, anti-collagen vascular entities, thyroid function testing and lumbar puncture. (Aetna - 530-0531).

Plaintiff underwent the prescribed laboratory testing on November 15, 2011. With the exception of elevated cholesterol, low vitamin D, low serum methylmalonic acid, and a "probably abnormal hemoglobin," Plaintiff's laboratory studies were unremarkable. (Aetna 0532-0547). Her visual studies were normal as was her echocardiogram with the exception of some calcification of the mitral valve. (Aetna 0548-0552). At her follow-up appointment with Dr. Leist on January 31, 2012, he stated that, "[b]ased on the available imaging studies, it appears less likely that Ms. Sessa suffers from a demyelinating disorder. It is possible that her white matter lesions are of migrainous origin or may be associated with the calcification of the valve." Dr. Leist seemed to be of the opinion that Plaintiff may have post-concussive syndrome. (Aetna 0561).

On March 2, 2012, Dr. Weinblatt performed the lumbar puncture (spinal tap) recommended by Dr. Leist. (Aetna 0728). In so doing, Dr. Weinblatt found slightly blood-tinged spinal fluid and the subsequent results from laboratory analysis revealed four oligoclonal bands present in her spinal fluid which were not found in her serum testing. Based upon this result, Dr.

Weinblatt stated that he felt "confident enough between her clinical picture, her MRI scan and her spinal fluid that I would treat her as clinically probable multiple sclerosis." (Aetna 0729). Dr. Weinblatt recommended that Plaintiff begin daily Copaxone injections and seek a third opinion "literally as a tie-breaker." (Aetna 0729).

On May 9, 2012, Ms. Sessa consulted Dr. Clyde Markowitz, a Neurologist at the Hospital of the University of Pennsylvania. After reviewing Plaintiff's laboratory studies, MRI reports and lumbar puncture results, Dr. Markowitz agreed with Dr. Weinblatt's assessment and likewise diagnosed her with multiple sclerosis. (Aetna 0564-0569). He referred her back to Dr. Weinblatt for ongoing treatment. From the additional medical reports contained in the administrative record, it appears that Plaintiff continues under Dr. Weinblatt's care for MS to the present.

In January, 2013, Plaintiff also came under the care of the neuropsychological practice at Bryn Mawr Rehabilitation Hospital and speech therapists in the hope that she would be able to optimize her functioning in activities of daily living such that she might be able to return to some kind of gainful employment in the future. (Aetna 0862-0869). As of the date of the last report in the record, on March 27, 2013, Plaintiff's condition had deteriorated such that she then was experiencing "moderate

weakness in immediate, divided and sustained attention, information processing, short term and working memory and areas of expressive language." She was "slow in generating words," "becomes easily overwhelmed by multiple variable tasks as well as by multi-step directives," and her "cognitive fatigue and pain significantly exacerbates her present cognitive impairments and, at times, hampers her ability to respond to questions." In addition, "Ms. Sessa's level of fatigue is so great that her ability to drive a vehicle is compromised." (Aetna 0869). On April 8, 2013, the Social Security Administration found that Plaintiff was disabled from working and that she became disabled under Social Security's rules on October 18, 2011, one day after she was terminated from her employment with Dell. (Aetna 0807-0813).

Of course, our consideration of the correctness of Aetna's decision must be guided by the language of the LTD policy itself. Under the heading *Important Information Regarding Availability of Coverage* found at page 2, the policy provides that "[u]nless specifically provided in any applicable termination provision described in this Booklet-Certificate or under the terms of the Group Insurance Policy, the plan does not pay benefits for a disability that starts before coverage starts under this plan. This plan will also not pay any benefits for any disability that starts after coverage ends." (Defendant's Administrative Record,

Aetna 0208).  On the following page, the following language

appears:

**Coverage for You**

**Long Term Disability Coverage**

The plan may pay to you a portion of your income earnings as
a monthly benefit for a period of long term disability
caused by an **illness** or **injury** that occurs while your
coverage is in effect. ...

(Aetna 0209).

The policy goes on to state at page 6,

**Long Term Disability Benefit Eligibility**

You will be considered disabled while covered under this
Long Term Disability (LTD) Plan on the first day that you
are disabled as a direct result of a significant change in
your physical or mental conditions and you meet all of the
following requirements:

*    You must be covered by the plan at the time you become
     disabled; and

*    You must be under the regular care of a **physician**.  You
     will be considered under the care of a **physician** up to
     31 days before you have been seen and treated in person
     by a **physician** for the **illness, injury** or pregnancy-
     related condition that caused the disability; and

*    You must be disabled by the **illness, injury,** or
     disabling-pregnancy-related condition as determined by
     **Aetna** (see *Test of Disability)*; and

*    You have been disabled for a consecutive period of 180
     calendar days or total of 180 calendar days in a
     rolling 12 month period, whichever occurs earlier.

(Aetna 0212).  The **Test of Disability** provides:

From the date that you first became disabled and until
monthly benefits are payable for 24 months you meet the test
of disability on any day that:

44

*　　You cannot perform the **material duties** of your **own occupation** solely because of an **illness, injury** or disabling pregnancy-related condition; and
　　　　　*　　Your earnings are 80% or less of your **adjusted predisability earnings.**

　　　　*After the first 24 months of your disability* that monthly benefits are payable, you meet the plan's test of disability on any day you are unable to work at any **reasonable occupation** solely because of an **illness, injury** or disabling pregnancy-related condition.

(Aetna 0213.

　　　On page 8, the LTD plan describes when long term disability

benefit eligibility ends:

　　　You will no longer be considered as disabled nor eligible for long term monthly benefits when the first of the following occurs:

　　　*　　The date you no longer meet the LTD test of disability, as determined by **Aetna.**
　　　*　　The date you are no longer under the regular care of a **physician.**
　　　*　　The date **Aetna** finds you have withheld information about working, or being able to work, at a **reasonable occupation.**
　　　*　　The date you fail to provide proof that you meet the LTD test of disability.
　　　*　　The date you refused to be examined by or cooperate with an independent **physician** or a licensed and certified health care practitioner, as requested. **Aetna** has the right to examine and evaluate any person who is the basis of your claim at any reasonable time while your claim is pending or payable.  The examination or evaluation will be done at **Aetna's** expense.
　　　*　　The date an independent medical exam report or functional capacity evaluation does not, in **Aetna's** opinion, confirm that you are disabled.
　　　*　　The date you reach the end of your Maximum Benefit Duration, as shown in the *Schedule of Benefits*.
　　　*　　The date you are not receiving **effective treatment for alcoholism or drug abuse,** if your disability is caused (in whole or part) by alcoholism or drug abuse.

* The date you refuse to cooperate with or accept:
  - Changes to your work site or job process designed to suit your identified medical limitations; or
  -Adaptive equipment or devices designed to suit your identified medical limitations; which would allow you to work at your **own occupation** or a **reasonable occupation** (if you are receiving benefits for being unable to work any **reasonable occupation**) and provided that a **physician** agrees that such changes, adaptive devices or equipment suit your particular medical limitations.
* The date you refuse any treatment recommended by your attending **physician** that, in **Aetna's** opinion, would cure, correct or limit your disability.
* The date your condition would permit you to:
  - Work; or
  - Increase the hours you work; or
  - Increase the number or type of duties you perform in your **own occupation** but you refuse to do so.
* The date of your death.
* The date after **Aetna** determines that you can participate in an **approved rehabilitation program** and you refuse to do so.

(Aetna 0214-0215). Coverage, on the other hand, ends for employees under the plan if:

* The plan is discontinued;
* You voluntarily stop your coverage;
* The group policy ends;
* You are no longer eligible for coverage;
* You do not make any required contributions;
* You become covered under another plan offered by your employer;
* Your employment stops for any reason, including job elimination or being placed on severance. This will be either the date you stop active work, or the day before the first premium due date that occurs after you stop active work. ...

(Aetna 0221).

As noted, we find it very difficult to discern from the contradictory verbiage in Aetna's letters the actual reason for its denial of Plaintiff's claim. For one, although it is clear

that an employee must be employed full time (at least 25 hours per week) and be actively at work on the date that *coverage* begins, we cannot find any language in the policy which requires an employee to be actively at work at the time their *disability* began. (See, Aetna 0210-0211, 1117-1118). Aetna's second letter of denial dated March 7, 2013, concluded that "[t]he medical evidence received and reviewed does not demonstrate an impairment that would preclude Ms. Sessa from performing the core duties of her own occupation as an Outside Sales Specialist II." (Aetna 1125-1126). In formulating this explanation, Aetna apparently considered some, but not all of the medical reports contained in the administrative record and was in evident disregard of the diagnosis of two of the neurologists whom plaintiff had consulted and of the job description of Plaintiff's position with Dell. (See, Aetna 0840).

Aetna's Final Decision issued on July 25, 2013 appears to return to the reasoning given in its first letter. In the July 25th Decision, Aetna first stated that it was upholding the denial because Plaintiff's last day worked was well before the onset of her absence from work due to her claimed disability again for some reason using April 1, 2012 as the first date of absence notwithstanding that Plaintiff was terminated for inability to perform her job on October 17, 2011. In Aetna's view, this rendered Plaintiff ineligible for LTD benefits because she was

not a covered employee at the time she became disabled and therefore it was not necessary to assess Plaintiff's functional abilities to determine if she was disabled within the meaning of the LTD policy. (Aetna 1142).

In issuing this decision, it appears that Aetna may have abused its discretion. Examining the administrative record in this matter as a whole clearly evinces that Plaintiff began experiencing the symptoms of MS in the summer of 2011 and that these symptoms began affecting her job performance at or around this same time such that Plaintiff felt the need to explain to her supervisor what was happening. (Aetna 0693). That she was clearly covered under the LTD policy at the time she began suffering from the symptoms of MS and that her condition as well as her job performance began to further deteriorate to the point that she was terminated from her employment with Dell is further borne out by the record. Clearly, it was by this point – October 17, 2011 that Plaintiff had become disabled, although she had yet to learn what was causing the disability. The policy, however, has no requirement that an employee have a definitive diagnosis. Rather, it states only that an employee is disabled on any day that he or she is unable to perform the material duties of his or her own occupation solely because of an illness, injury or disabling pregnancy-related condition and their earnings are less

than 80% of their adjusted predisability earnings.[8]  Hence, at

least as of October 18, 2011, the day after Plaintiff was fired

and on the same date that the Social Security Administration

found Plaintiff's disability to have commenced,[9] her income was

presumably less than 80% of what it had been just the day before.

While Aetna appears to have partially based its decision on

the assumption that Plaintiff's coverage ended on October 17,

2011, this is not clear from the nearly 2000-page administrative

record.  Indeed, under the heading **"When Coverage Ends For**

**Employees,"** the policy also provides as follows in relevant part:

> However, if premium payments are made on your behalf, your
> coverage may continue until stopped by your employer as
> described below:
>
> -    Your Employer will notify Aetna of the date your
>      coverage ceases for the purposes of termination of
>      coverage under this Plan.  Unless otherwise specified
>      below, your official end of coverage date will be the
>      end of the month in which you are no longer eligible

---

[8]    See, e.g., Mitchell v. Eastman Kodak Co., 113 F.3d 433, 441 (3d Cir.
1997) *(abrogated on other grounds by* Metropolitan v. Glenn, supra.)(rejecting
employer and claims administrator's argument that employee's medical records
failed to establish that he was "totally disabled" because records failed to
contain explicit doctor's statement that claimant employee was totally
disabled prior to end of eligibility, where claimant's doctor noted onset of
symptoms prior to end of eligibility period).

[9]    The Third Circuit, among others, has held that the SSA's decision
may be considered as a factor in evaluating whether a plan administrator has
acted arbitrarily and capriciously in reviewing a plaintiff's claim for
benefits, though an award of benefits by the Social Security Administration
does not in and of itself indicate that an administrator's decision was
arbitrary and capricious and a plan administrator is not bound by the SSA
decision.  See, Bennett v. Kemper National Services, 514 F.3d 547, 554 (6th
Cir. 2008); Marciniak v. Prudential Financial Insurance Co. Of America, No.
05-4456, 184 Fed. Appx. 266, 269, 2006 U.S. App. LEXIS 15607, *6 (3d Cir. June
21, 2006); Reed v. Citigroup, Inc., Civ. A. No. 12-2934, 2015 U.S. Dist. LEXIS
43364, *51 (D. N.J. April 1, 2015); Connor v. Sedgwick Claims Mgmt. Services,
796 F. Supp. 2d 568, 584-585 (D.N.J. 2011).

under the plan.

> For the purposes of this section, "month" means the period from a date in a calendar month to the corresponding date in the succeeding calendar month. If the succeeding calendar month does not have a corresponding date, the period ends on the last day of the succeeding calendar month.

> ...

(Aetna 0221).  In the absence of definitive evidence on these points, *i.e.*, when Plaintiff's income dropped to less than 80% of what it had been before her disability began to manifest itself, whether premium payments were made on Plaintiff's behalf and whether and when Dell informed Aetna that Plaintiff had been terminated from her employment, we find genuine issues of material fact to exist.  Accordingly, we cannot make a conclusive finding that Aetna did or did not abuse its discretion and for this reason, we must deny the parties' summary judgment motions as to Count II of the Complaint.

*D. Breach of Fiduciary Duty*

As discussed, ERISA fiduciaries owe certain fiduciary duties to plan participants which are described in 29 U.S.C. §1104. Under §1104(a), a fiduciary shall discharge his duties with the care, skill, prudence, and diligence of a prudent man solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of plan administration, in accordance with plan documents and

instruments. "To be a fiduciary within the meaning of §1002(21)(A), a person must 'act in the capacity of manager, administrator, or financial advisor to a plan.'" <u>Santomenno</u>, 768 F. 3d at 291 (quoting <u>Pegram v. Herdrich</u>, 530 U.S. at 222, 120 S. Ct. 2143). Further, a breach of fiduciary duty may arise from a misrepresentation or a failure to provide information on the part of the ERISA fiduciary, even with regard to something about which a beneficiary has not specifically inquired. <u>See</u>, <u>e.g.</u>, <u>Unisys Corp. Retiree Medical Benefits ERISA Litigation</u>, 579 F.3d at 228); <u>Peterson v. AT & T</u>, 127 Fed. Appx. at 71; <u>Horvath v. Keystone Health Plan East, Inc.</u>, 333 F. 3d 450, 461 (3d Cir. 2003).

In reviewing the administrative record in this matter in its entirety and as a whole in the context of Plaintiff's claim that all of the defendants breached their fiduciary duties to her, we can make no other finding but that on this issue too there are genuine issues of material fact that cannot be resolved by the existing record itself. In particular, the inconsistencies in the explanations provided for the denial of Plaintiff's claims, the evident disregard for those portions of the medical reports and records which supported a finding of disability in favor of the far more limited portions which might be understood to support a contrary finding, and the glaring disregard of Plaintiff's reports of her medical problems to her supervisor and

the human relations officers at her employer all militate in favor of a finding that the fiduciary obligations which one or more of these defendants owed to Plaintiff under the Plan were breached.  Inasmuch as the record is relatively undeveloped as to the role which each defendant played in the decision making process and in relaying or not relaying information, however, we cannot make a definitive assessment of the extent to which each party or parties may be held liable to plaintiff.  So saying, the motions for summary judgment as to Count III are likewise denied.

An appropriate order follows.